See also 586 F.3d 263.

Nikki BRUNI; Julie Cosentino; Cynthia Rinaldi; Kathleen Laslow; Patrick Malley, Appellants,

v.

CITY OF PITTSBURGH; Pittsburgh City Council; Mayor of Pittsburgh.

No. 15–1755

United States Court of Appeals, Third Circuit.

Argued November 6, 2015

(Filed June 1, 2016)

---

Matthew S. Bowman [ARGUED], Alliance Defending Freedom, 440 First St., NW—Ste. 600, Washington, DC 20001, David A. Cortman, Alliance Defense Fund, 1000 Hurricane Shoals, N.E., Bldg. D—Ste. 1100, Lawrenceville, GA 30043, Elissa M. Graves, Alliance Defending Freedom, 15100 North 90th Street, Scottsdale, AZ 85260, Lawrence G. Paladin, Jr., #6C, 15 Duff Road, Pittsburgh, PA 15235, Counsel for Appellants.

Michael E. Kennedy, Matthew S. McHale [ARGUED], Lourdes Sanchez Ridge, City of Pittsburgh, Department of Law, 414 Grant Street, 313 City County Bldg., Pittsburgh, PA 15219, Counsel for Appellees.

Erek L. Barron, Whiteford Taylor & Preston, 7501 Wisconsin Avenue, Ste. 700 West, Bethesda, MD 20814, Counsel for Amicus Curiae. ·

Before: FUENTES, JORDAN, and VANASKIE, Circuit Judges.

OPINION OF THE COURT

JORDAN, Circuit Judge.

This case puts at issue again an ordinance of the City of Pittsburgh that prohibits certain speech within fifteen feet of health care facilities. Plaintiffs Nikki Bruni, Julie Cosentino, Cynthia Rinaldi, Kathleen Laslow, and Patrick Malley engage in what they call "sidewalk counseling" on the public sidewalk outside of a Pittsburgh Planned Parenthood facility in an effort, through close conversation, to persuade women to forego abortion services. The Plaintiffs filed suit in the United States District Court for the Western District of Pennsylvania, claiming that the Pittsburgh ordinance limiting their ability to approach people near the Planned Parenthood entrance violates their First and Fourteenth Amendments rights. We previously upheld the City's so-called "buffer zone" ordinance against the same kind of challenge in *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009). Despite that, the Plaintiffs argue that the Supreme Court's recent decision in *McCullen v. Coakley*, —— U.S. ——, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014)—which struck down a similar Massachusetts state law—has sufficiently altered the constitutional analysis to compel a different result than we reached in *Brown*. The District Court disagreed, hewing to our analysis in *Brown* and thus largely dismissing the Plaintiffs' constitutional challenge to the Ordinance.[1]

---

1. As more fully noted herein, *see infra* 359 n.5, some of the Plaintiffs' claims were permitted to stand but the Plaintiffs have since voluntarily dismissed them.

We will vacate in part and affirm in part. Considered in the light most favorable to the Plaintiffs, the First Amendment claims are sufficient to go forward at this stage of the litigation. The speech at issue is core political speech entitled to the maximum protection afforded by the First Amendment, and the City cannot burden it without first trying, or at least demonstrating that it has seriously considered, substantially less restrictive alternatives that would achieve the City's legitimate, substantial, and content-neutral interests. *McCullen* teaches that the constitutionality of buffer zone laws turns on the factual circumstances giving rise to the law in each individual case—the same type of buffer zone may be upheld on one record where it might be struck down on another. Hence, dismissal of claims challenging ordinances like the one at issue here will rarely, if ever, be appropriate at the pleading stage. Instead, factual development will likely be indispensable to the assessment of whether an ordinance is constitutionally permissible. We express no view on the ultimate merits of the Plaintiffs' claims in this case, but, following the guidance of *McCullen*, we will vacate the dismissal of the First Amendment claims so that they may be considered after appropriate development of a factual record. Because the First Amendment claims cover all of the Plaintiffs' contentions, and the Fourteenth Amendment claim is simply a recasting of free expression arguments, we will affirm the dismissal of that claim.

## I. BACKGROUND [2]

### A. The Ordinance

On December 13, 2005, Pittsburgh's City Council adopted Ordinance No. 49, which added Chapter 623 to the Pittsburgh Code of Ordinances. That Chapter, titled "Public Safety at Health Care Facilities," went into effect later in the month.

The part of the Ordinance that is now in dispute is § 623.04, which establishes a "Fifteen–Foot Buffer Zone." It states that:

> [n]o person or persons shall knowingly congregate, patrol, picket or demonstrate in a zone extending fifteen (15) feet from any entrance to the hospital and or health care facility. This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic.

Pittsburgh Pa., Code § 623.04. Although the term "health care facility" is not defined in the Chapter, a "[m]edical office/clinic" is defined as "an establishment providing therapeutic, preventative, corrective, healing and health-building treatment services on an out-patient basis by physicians, dentists and other practitioners." *Id.* § 623.02.

In adopting the buffer zone Ordinance, the City Council also ratified a preamble, titled "Intent of Council," that described the goals the City sought to accomplish:

> The City Council recognizes that access to Health Care Facilities for the purpose of obtaining medical counseling and treatment is important for residents and visitors to the City. The exercise of a person's right to protest or counsel

---

**2.** Because the District Court dismissed the Plaintiffs' Complaint in response to the City's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), in setting out the factual background here, we accept as true all facts alleged in the Complaint and draw all reasonable inferences in favor of the Plaintiffs. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

against certain medical procedures is a First Amendment activity that must be balanced against another person's right to obtain medical counseling and treatment in an unobstructed manner; and The City of Pittsburgh Bureau of Police has been consistently called upon in at least two (2) locations within the City to mediate the disputes between those seeking medical counseling and treatment and those who would counsel against their actions so as to (i) avoid violent confrontations which would lead to criminal charges and (ii) enforce existing City Ordinances which regulate use of public sidewalks and other conduct;

Such services require a dedicated and indefinite appropriation of policing services, which is being provided to the neglect of the law enforcement needs of the Zones in which these facilities exist. The City seeks a more efficient and wider deployment of its services which will help also reduce the risk of violence and provide unobstructed access to health care facilities by setting clear guidelines for activity in the immediate vicinity of the entrances to health care facilities;

The Council finds that the limited buffer and bubble zones outside of health care facilities established by this chapter will ensure that patients have unimpeded access to medical services while ensuring that the First Amendment rights of demonstrators to communicate their message to their intended audience is not impaired.

*Id.* § 623.01. Violations of the Ordinance are met with graduated penalties, ranging from a $50 fine for a first offense to a thirty-day maximum (and three-day mini-

mum) jail sentence for a fourth violation within five years. *Id.* § 623.05. As originally passed, the Ordinance also included an eight-foot "floating bubble zone," which established a 100–foot area around clinics in which people could not be approached without their consent within eight feet "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling." *Id.* § 623.03.

The Ordinance was challenged in court shortly after its passage. In *Brown v. City of Pittsburgh*, we held that, although the fifteen-foot fixed buffer zone and the eight-foot floating bubble zone were each on their own constitutionally permissible, the combination of the two imposed a facially-unconstitutional burden on free speech. 586 F.3d at 276, 281. On remand, the District Court issued an order permanently enjoining enforcement of the eight-foot floating bubble zone. Importantly for present purposes, the order also required that the fifteen-foot buffer zone be construed to prohibit "any person" from "picket[ing] or demonstrat[ing]" within the fixed buffer zone.[3] (App. at 150a.) The Plaintiffs challenge the constitutionality of the law as modified by the permanent injunction.

## B. Application of the Ordinance

Although the Ordinance applies, on its face, at all hospitals and health care facilities in Pittsburgh, the City has demarcated only two actual buffer zones, both outside the entrances of facilities that provide abortion services. The allegations in the Complaint relate primarily to the Plaintiffs' experiences at one of those two locations—the Planned Parenthood facility located at 933 Liberty Avenue. At the front

---

**3.** The order also required the City to provide training to the Pittsburgh City Police concerning proper enforcement of the Ordinance and to mark clearly the boundaries of any fixed buffer zone.

of that facility, a painted yellow semi-circle marks the buffer zone boundary within which the Ordinance bans demonstrating or picketing.

According to their Complaint, the Plaintiffs "regularly engage in peaceful prayer, leafleting, sidewalk counseling, pro-life advocacy, and other peaceful expressive activities" outside of that Planned Parenthood location. (App. at 51a.) In their sidewalk counseling, they "seek to have quiet conversations and offer assistance and information to abortion-minded women by providing them pamphlets describing local pregnancy resources, praying, and ... peacefully express[ing] this message of caring support to those entering and exiting the clinic." (App. at 58a.) The City reads the Ordinance to prohibit sidewalk counseling as a form of "demonstrating" and has enforced the ban against those who, like the Plaintiffs, would engage in counseling within the buffer zone. The prohibition "make[s] it more difficult [for the] Plaintiffs to engage in sidewalk counseling, prayer, advocacy, and other expressive activities." (App. at 60a.) Because close, personal interaction is "essential to [the Plaintiffs'] message," as they wish to be viewed as counselors, "rather than to merely express [their] opposition to abortion or to be seen as protesting" (App. at 60a–61a), the Ordinance frustrates effective communication of their message. The prohibition

also interferes with the Plaintiffs' activities because they "are often unable to distinguish patients from passer[s]by at the distance that the zones require [the] Plaintiffs to remain." (App. at 61a.) [4]

### C. Procedural History

Less than two years ago, the Supreme Court decided *McCullen v. Coakley*, —— U.S. ——, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014), which struck down a Massachusetts fixed buffer zone statute as insufficiently narrowly tailored to achieve the significant government interests asserted for it. Soon thereafter, the Plaintiffs in this suit filed their claims under 42 U.S.C. § 1983 against the City of Pittsburgh, the Pittsburgh City Council, and the Mayor of Pittsburgh. The Plaintiffs brought facial challenges against the Ordinance under the First Amendment's Free Speech and Free Press Clauses, and another facial challenge under the Due Process Clause of the Fourteenth Amendment.[5] They also sought a preliminary injunction to prevent the City from enforcing the Ordinance against them. The City responded with a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint for failure to state a claim.

The District Court held a hearing on the motion for a preliminary injunction, at which the Court heard testimony from Plaintiff Bruni and Ms. Kimberlee Evert, the CEO and President of Planned Parent-

---

4. In their Complaint, the Plaintiffs also describe specific episodes that have occurred outside of the Liberty Avenue Planned Parenthood, episodes in which their counseling was interrupted. For example, Plaintiff Cosentino stated that on one occasion a clinic escort "yelled loudly" at her while she was speaking with a young woman outside of the buffer zone, and multiple clinic employees then "surrounded the young woman" and led her into the clinic. (App. at 58a–59a.) On another occasion, Plaintiff Rinaldi stated that a security guard stifled her speech outside of the

buffer zone while she was discussing adoption options with a young woman.

5. The Plaintiffs' Complaint also included as-applied challenges, an Equal Protection claim, and a selective enforcement claim against the Mayor of Pittsburgh, all of which the District Court did not dismiss. After the District Court's ruling, the Plaintiffs moved to voluntarily dismiss those remaining claims, which are, consequently, not before us on appeal.

hood of Western Pennsylvania. The parties also submitted documentary evidence. The City submitted declarations from Evert and Ms. Paula Harris, a "clinic escort" at the facility.[6] The Plaintiffs submitted two affidavits, one from Plaintiff Laslow and the other from their counsel, Matthew Bowman.

The District Court granted the City's motion to dismiss the Plaintiffs' facial challenges to the Ordinance under the First Amendment and the Due Process Clause of the Fourteenth Amendment.[7] In addition, the Court denied the Plaintiffs' motion for a preliminary injunction.

The Plaintiffs then filed this timely appeal. They seek review only of the dismissal of their First Amendment and Due Process claims against the City and not the denial of their preliminary injunction motion.

## II. Discussion [8]

### A. Standard of Review

■ "[O]ur standard of review of a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) is plenary." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006). In considering a Rule 12(b)(6) motion, courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks omitted). While "accept[ing] all of the complaint's well-pleaded facts as true," the district court "may disregard any legal conclusions." *Id.* at 210–11.

■ In considering a motion to dismiss, the district court is also bound not to "go beyond the facts alleged in the Complaint and the documents on which the claims made therein [are] based." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997). The court may, however, rely upon "exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). If other "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). When that occurs, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*[9] "The element that triggers the conversion [from a Rule 12(b)(6) dismissal motion into a Rule 56 motion for summary judgment] is a challenge to the sufficiency of the pleader's claim supported by extra-pleading material." 5C Charles Alan Wright et al., *Fed. Prac. & Proc. Civ.* § 1366 (3d ed.). "The reason that a court

---

6. "A clinic escort is a volunteer who is trained to walk alongside patients and their companions who want to be accompanied as they approach or leave a health care facility." (App. at 152a.)

7. The Court also dismissed all claims against the City Council, which the Plaintiffs do not challenge in this appeal.

8. The District Court had subject matter jurisdiction under 28 U.S.C. § 1331; we exercise jurisdiction pursuant to 28 U.S.C. § 1291.

9. Although notice need not be express, we have recommended that district courts provide express notice because it "is easy to give and removes ambiguities." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 288 n. 11 (3d Cir. 1999). The City's motion to dismiss was styled only as a motion to dismiss and made no reference to possible conversion into a summary judgment motion. A review of the transcript of the motions hearing verifies that neither the Court nor the parties ever mentioned such a conversion.

must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond." *Pension Benefit. Guar. Corp.*, 998 F.2d at 1196.

■ The District Court here based its decision to dismiss not only upon the allegations in the Complaint but also, it appears, upon testimony given at the hearing and the supplemental declarations filed by Harris, Evert, Laslow, and Bowman. Indeed, in dismissing the Plaintiffs' facial challenges to the Ordinance, the Court seems to have based its decision entirely on its analysis of the merits of the preliminary injunction motion.[10] Although it relied upon extra-pleading materials, the Court never discussed treating the motion as one for summary judgment.

■ Thus before reaching the merits, we face a difficulty. "We have previously stated that the label a district court places

on its disposition is not binding on an appellate court." *Rose v. Bartle*, 871 F.2d 331, 339–40 (3d Cir. 1989). Because the District Court relied, at least in part, on materials presented outside of the pleadings, "we are constrained ... to treat the district court's disposition of the matter pursuant to Rule 56, and not Rule 12(b)(6)." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 284 (3d Cir. 1991). But the Plaintiffs were not given the "reasonable opportunity" to present additional evidence as was their right under Rule 12(d). That was error. "We have held that it is reversible error for a district court to convert a motion under Rule 12(b)(6) ... into a motion for summary judgment unless the court provides notice of its intention to convert the motion and allows an opportunity to submit materials admissible in a summary judgment proceeding or allows a hearing."[11] *Rose*, 871 F.2d at 342.

**10.** Specifically, the District Court engaged in a careful analysis of the merits of the Plaintiffs' preliminary injunction motion, and then incorporated that analysis into a relatively brief discussion of the motion to dismiss by saying only, *"See* analysis *supra."* (App. at 35a.)

**11.** It is not enough that the Plaintiffs had an opportunity to submit evidence in connection with the preliminary injunction motion. Even if the parties understood that the City's motion to dismiss was being converted to a motion for summary judgment, the standards governing a motion for a preliminary injunction and a motion for summary judgment are entirely different, and it cannot be assumed that a response to one was meant as a response to the other. As the Plaintiffs point out, evidence was offered only to support their request for a preliminary injunction, and should not have been treated as their entire defense to an improperly-converted summary judgment motion "without giving [Plaintiffs] an opportunity to show ... that the City's evidence fails" to withstand proper scrutiny. (Reply Br. at 22.) With no reflection of notice or an agreement to treat the record developed

for the preliminary injunction as being a full record for summary judgment, conversion of the motion was not justified. Moreover, the "undeveloped factual record" (App. at 22a) that the District Court determined was insufficient to support a preliminary injunction was no better developed for purposes of summary judgment.

Even had the District Court restricted its review to the pleadings, it erred by directly equating the standard for evaluating a preliminary injunction with the standard applicable to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). On a motion for a preliminary injunction, a plaintiff bears the burden to show, among other things, "that he is likely to succeed on the merits...." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citation omitted). To withstand a motion to dismiss, on the other hand, a plaintiff need only demonstrate that he "may be entitled to relief under any reasonable reading of the complaint," *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010), and "[t]he defendant bears the burden of showing that no claim has been presented," *Hedges v. United States*, 404 F.3d 744, 750 (3d

■ Nevertheless, the failure to follow the dictates of Rule 12(d) is subject to a harmless error analysis and may be excused if no prejudice to the plaintiffs would result. *Ford Motor Co.*, 930 F.2d at 284–85. "Thus, even where the opportunity to submit pertinent material is not given, a grant of summary judgment for a defendant may be affirmed where there is no state of facts on which plaintiff could conceivably recover." *Id.* at 285 (internal quotation marks omitted). In our harmless error analysis, the "standard of review . . . is plenary: we may affirm if, and only if, on the basis of the complaints filed by these plaintiffs there was no set of facts which could be proven to establish defendants' liability." *Rose*, 871 F.2d at 342. We therefore review the Complaint against the motion to dismiss standard. Neither the documentary nor the testimonial evidence submitted below will be considered in assessing the merits of the City's motion to dismiss.[12]

## B. Merits Analysis

■ On appeal, the Plaintiffs' mount facial challenges to the Ordinance under both the Free Speech and Free Press Clauses of the First Amendment as proscribing protected speech, and under the Due Process Clause of the Fourteenth Amendment due to the Ordinance's allegedly vesting "unbridled discretion" in City officials. (Opening Br. at 16.) A facial challenge "seeks to vindicate not only [a plaintiff's] own rights, but those of others who may also be adversely impacted by the

statute in question." *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 623 (3d Cir. 2013) (quoting *City of Chi. v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)). A successful as-applied challenge bars a law's enforcement against a particular plaintiff, whereas a successful facial challenge results in "complete invalidation of a law." *CMR D.N. Corp.*, 703 F.3d at 624. The distinction between facial and as-applied constitutional challenges, then, is of critical importance in determining the remedy to be provided.

■ In evaluating a facial challenge we must look beyond the application of an ordinance in the specific case before us. To ultimately succeed on the merits, a plaintiff theoretically has "to establish that no set of circumstances exists under which [the ordinance] would be valid, or that the [ordinance] lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (internal citations and quotation marks omitted). In the First Amendment context, the Supreme Court has softened that daunting standard somewhat, saying that a law may also be invalidated on its face "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 473, 130 S.Ct. 1577 (internal citations and quotation marks omitted).

■ Despite those pronouncements, the Supreme Court has also recognized

---

Cir. 2005). Given the significant differences between those two standards, a plaintiff's failure to meet his burden on a motion for a preliminary injunction does not mean *ipso facto* that the complaint fails to state a claim.

12. The amicus brief submitted by Planned Parenthood of Western Pennsylvania and Pittsburgh Pro–Choice Escorts also includes a considerable amount of evidence that purports to be testimony taken by the Pittsburgh City Council during the original 2005 hearing

on whether to adopt the Ordinance. The testimony may be significant, as it speaks to the alleged need for the buffer zones and the alternatives employed by the City prior to its enactment. But we cannot consider it in our review, as the testimony would, again, effectively convert the motion to dismiss into one for summary judgment. Moreover, it does not appear to have been before the District Court and is not part of the record in this case.

that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. FEC*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 194, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010) ("The label is not what matters."). As already stated, the distinction goes to the breadth of the remedy provided, but "not what must be pleaded in a complaint." *Citizens United*, 558 U.S. at 331, 130 S.Ct. 876. The Court has often considered facial challenges simply by applying the relevant constitutional test to the challenged statute, without trying to dream up whether or not there exists some hypothetical situation in which application of the statute might be valid. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124–25 (10th Cir. 2012) (collecting cases); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (warning courts deciding facial challenges not to "speculate about 'hypothetical' or 'imaginary' cases"); *Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Stevens, J., respecting denial of cert.) (noting that the "no set of circumstances" formulation "has been properly ignored in subsequent cases," and collecting cases). "[W]here a statute fails the relevant constitutional test (such as strict scrutiny ... or reasonableness review), it can no longer be constitutionally applied to anyone—and thus there is 'no set of circumstances' in which the statute would be valid. The relevant constitutional test, however, remains the proper inquiry." *Doe*, 667 F.3d at 1127. We therefore consider the Plaintiffs' facial challenge to the City's buffer zone Ordinance by resort to the analytical framework governing free speech claims.

### 1. Free Speech Claim

 That framework typically begins with an assessment of whether the challenged law restricts speech based upon its content. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (internal quotation marks omitted). Such "[c]ontent-based prohibitions ... have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). To guard against that threat, the First Amendment requires that, if a statute draws a content-based distinction—thereby favoring some ideas over others—we apply strict scrutiny to the challenged law. Under that heightened scrutiny, the law is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015). A content-based restriction, unlike a neutral law, must also be "the least restrictive or least intrusive means of serving the government's interests." *McCullen*, 134 S.Ct. at 2535 (internal quotation marks omitted). As such, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011) (internal quotation marks omitted). If, on the other hand, the law is content-neutral, we apply intermediate scrutiny and ask whether it is "narrowly tailored to serve a significant governmental interest." *Mad-*

*sen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).

### a. Assuming Content Neutrality

The Plaintiffs contend that the Ordinance constitutes a content-based restriction on speech and is thus subject to strict scrutiny. Although we held in *Brown* that Pittsburgh's buffer-zone Ordinance was content-neutral, *see Brown,* 586 F.3d at 275, the Plaintiffs argue that that conclusion is inconsistent with the Supreme Court's post-*Brown* decision in *Reed v. Town of Gilbert,* —— U.S. ——, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015), which they say changed how courts draw the line between content-neutral and content-based restrictions. In *Reed,* the Supreme Court held that a town code governing the manner of display of outdoor signs that distinguished between ideological, political, and directional signs was an impermissible content-based restriction on speech. In reaching that conclusion, the Court defined content-based laws as "those that target speech based on its communicative content. . . ." *Reed,* 135 S.Ct. at 2226. Of relevance here, the Court identified a "subtle" way in which statutes can, on their face, discriminate based upon content, namely by "defining regulated speech by its function or purpose." *Id.* at 2227. The Plaintiffs in the present case contend that, in defining proscribed expression as that which involves "demonstrating" or "picketing," Pittsburgh's Ordinance runs afoul of *Reed* by limiting speech based upon its intended purpose.

Although the Plaintiffs make a compelling argument that *Reed* has altered the applicable analysis of content neutrality, we need not consider the impact of *Reed* because the Complaint presents a viable free speech challenge to the buffer-zone Ordinance under the lower standard of scrutiny to which a content-neutral restriction on speech is subject. We can assume the Ordinance is content-neutral, even though the City contends we may not do so—which is ironic since the City is the party benefitting from the assumption. The City relies on *McCullen,* pointing out that the Supreme Court, in striking down the Massachusetts buffer zone law, addressed content-neutrality to determine the applicable level of scrutiny. 134 S.Ct. at 2530. The Court concluded that the Massachusetts law, which prohibited "knowingly stand[ing]" within thirty-five feet of the entrance of facilities where abortions are performed, *id.* at 2525, was a content-neutral restriction on free expression, *id.* at 2534. Although the Court recognized that it was empowered to simply assume, without deciding, that the law was subject to a less stringent level of scrutiny—as it ultimately struck down the statute under that lesser scrutiny anyway—it went ahead and engaged in the content-neutrality analysis at the first step, the "ordinary order of operations," because doing so would not have placed the Court at risk of "overruling a precedent." [13] *Id.* at 2530.

Here, by contrast, the conclusion that the Ordinance is a content-based restriction on speech would require us to overrule our holding in *Brown* that the Ordinance imposes only a content-neutral ban. We need not take that step, though, as we would reverse the dismissal of the Plaintiffs' free speech claim even under the

---

**13.** To clarify the point, the Supreme Court contrasted an earlier case, *McCutcheon v. FEC,* —— U.S. ——, 134 S.Ct. 1434, 1445–46, 188 L.Ed.2d 468 (2014). In *McCutcheon,* the Court assumed a lower level of First Amendment scrutiny in striking down a challenged statute because deciding to apply heightened scrutiny would have needlessly required the Court to revisit its past decisions on the subject.

lesser scrutiny reserved for content-neutral restrictions on speech. Accordingly, we will assume, as was held in *Brown*, that the Ordinance is content neutral and apply the intermediate level of scrutiny due such restrictions.[14]

### b. Brown *and its Antecedents*

To satisfy intermediate scrutiny, a content-neutral limitation on speech "must be 'narrowly tailored to serve a significant governmental interest.' " *McCullen*, 134 S.Ct. at 2534 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." *Id.* (internal quotation marks and brackets omitted). Before *McCullen*, the Supreme Court had decided three cases involving similar buffer zones at medical facilities. In the first two of those cases—*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) and *Schenck v. Pro–Choice Network of Western New York*, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997)—the Court confronted the issue in the context of injunctions prohibiting specific individuals from interfering with public access to clinics. It viewed both restrictions, a thirty-six foot buffer zone in *Madsen* and a fifteen foot zone in *Schenck*, as sufficiently narrowly tailored and thus upheld them under intermediate scrutiny.

In *Madsen*, the Court noted that the thirty-six foot buffer zone at issue in that case was created by way of injunctive relief only after a first injunction (which enjoined the specified protesters from

blocking or interfering with public access to the clinic) proved insufficient to serve the government's stated interests. *Madsen*, 512 U.S. at 769–70,, 114 S.Ct. 2516. The Court also emphasized that "the state court found that [those protesters] repeatedly had interfered with the free access of patients and staff" to the clinic in question before issuing the injunction, leaving the state court with "few other options to protect access" to the clinic. *Id.* at 769, 114 S.Ct. 2516.

Similarly, in *Schenck*, the Court upheld the fixed buffer zone because "the record show[ed] that protesters purposefully or effectively blocked or hindered people from entering and exiting the clinic doorways, from driving up to and away from clinic entrances, and from driving in and out of clinic parking lots." 519 U.S. at 380, 117 S.Ct. 855. The *Schenck* Court also struck down a floating bubble zone as insufficiently tailored to the government's interests. *Id.* at 377–80, 117 S.Ct. 855. The restriction was overbroad chiefly because of the type of speech it restricted (leafleting and other comments on matters of public concern) and the nature of the location (a public sidewalk). *Id.* at 377, 117 S.Ct. 855. The Court emphasized the potential for uncertainty that a floating bubble zone creates—"[w]ith clinic escorts leaving the clinic to pick up incoming patients and entering the clinic to drop them off, it would be quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction"—and the resultant "substantial risk that much more speech will be burdened than the injunction by its terms prohibits." *Id.* at 378, 117 S.Ct. 855. In contrast with the

---

**14.** Although we do not address the issue, should it arise and need to be addressed on remand, the District Court will need to examine *Reed* and its effect on the content-neutrali-

ty analysis to decide whether that case compels a break from *Brown's* holding that the Ordinance is a content-neutral restriction on speech.

fixed buffer zone which was upheld, the floating zone "[could] not be sustained on th[e] record" before the Court. *Id.* at 377, 117 S.Ct. 855.

In the third buffer zone case, *Hill v. Colorado*, the Supreme Court held, in spite of its earlier ruling in *Schenck*, that an eight-foot floating bubble zone satisfied intermediate scrutiny's narrow tailoring requirement. 530 U.S. 703, 725, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). The *Hill* Court explained the differences between the bubble zones in the two cases. *See id.* at 726–27, 120 S.Ct. 2480. *Schenck* involved a fifteen-foot bubble zone, whereas *Hill's* was eight feet, which, the Court concluded, allowed speech "at a normal conversational distance." *Id.* at 726–27, 120 S.Ct. 2480 (internal quotation marks omitted). By the Court's estimation, the eight-foot zone would have no "adverse impact" on one's ability to read a sign, would permit oral communication "at a normal conversational distance," and would not "prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material. . . ." *Id.* at 726–27, 120 S.Ct. 2480 (internal quotation marks omitted). "Signs, pictures, and voice itself can cross an 8–foot gap with ease." *Id.* at 729, 120 S.Ct. 2480. Additionally, the *Hill* statute allowed the speaker to remain in one place while other people passed within eight feet. *Id.* at 727, 120 S.Ct. 2480. Finally, the *Hill* statute also required that any violation be "knowing," so that an inadvertent breach of the zone would not be unlawful. *Id.*

Although we previously concluded in *Brown* that the City's Ordinance was sufficiently narrowly tailored, we did so out of deference to the Supreme Court's holdings in *Madsen* and *Schenck*. *See Brown*, 586 F.3d at 276. But each of those cases, as well as *Hill*, implies that the application of intermediate scrutiny's narrow tailoring

analysis must depend on the particular facts at issue. That implication was made explicit in *McCullen*.

#### c. McCullen's *Clarification of the Law*

In *McCullen*, the Supreme Court struck down the Massachusetts law's thirty-five foot buffer zone as insufficiently narrowly tailored under intermediate scrutiny. It concluded that the zone "burden[s] substantially more speech than necessary to achieve the Commonwealth's asserted interests." *McCullen*, 134 S.Ct. at 2537. The Court started its analysis by recognizing the nature of the burden the buffer zone imposed upon the petitioners' speech. Like the Plaintiffs here, the petitioners in *McCullen* engaged in sidewalk counseling in an effort to persuade women entering abortion facilities to consider alternatives. *Id.* at 2527. Given that mode of expression, the Court emphasized the petitioners' need to engage in "personal, caring, consensual conversations" rather than "chanting slogans and displaying signs" as a form of protest against abortion. *Id.* at 2536. It was thus insufficient that the counselors could be seen and heard at a distance by the women in the buffer zone, because "[i]f all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message." *Id.* at 2537.

The limitation on their speech also occurred, as it does here, in the quintessential public forum of public streets and sidewalks, areas that occupy "a special position in terms of First Amendment protection. . . ." *Id.* at 2529 (internal quotation marks omitted). The restriction thus struck at the heart of speech protected by the First Amendment. *See id.* at 2536 ("[W]hile the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms— such as normal conversation and leaflet-

ting on a public sidewalk—have historically been more closely associated with the transmission of ideas than others."). "When the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden." *Id.*

Balanced against that significant burden on speech was the means chosen to effectuate the government's purpose. *McCullen* emphasized the unusual nature of such buffer zone laws—at the time *McCullen* was decided, only six (including Pittsburgh's) existed across the entire United States, *id.* at 2537 n. 6—which "raise[d] concern that the Commonwealth ha[d] too readily forgone options that could serve its interests just as well...." *Id.* at 2537. In the Supreme Court's view, Massachusetts had a number of less speech-restrictive alternatives available to address its goals: it could utilize "existing local ordinances" banning obstruction of public ways, *id.* at 2538; "generic criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the like," *id.*; and "targeted injunctions" like those in *Madsen* and *Schenck*, *id.* The Court also emphasized that the congestion problem the Commonwealth cited arose mainly at one Boston clinic, which did not justify "creating 35–foot buffer zones at every clinic across the Commonwealth." *Id.* at 2539.

The Court further rejected the Commonwealth's contention that it "ha[d] tried other approaches, but they do not work." *Id.* Although the Commonwealth claimed it had revised the statute because an earlier, less restrictive, version was too difficult to enforce, the Court noted that Massachusetts could not document a single prosecution brought under its previous statutes "within at least the last 17 years" and "the last injunctions ... date[d] to the 1990s." *Id.* The Commonwealth had thus not met its narrow-tailoring burden because it

"ha[d] not shown that it seriously undertook to address the problem with less intrusive tools readily available to it. Nor ha[d] it shown that it considered different methods that other jurisdictions have found effective." *Id.* In light of the "vital First Amendment interests at stake, it [was] not enough for Massachusetts simply to say that other approaches have not worked." *Id.* at 2540. It had to either back up that assertion with evidence of past efforts, and the failures of those efforts, to remedy the problems that existed outside of the Commonwealth's abortion clinics, or otherwise demonstrate its serious consideration of, and reasonable decision to forego, alternative measures that would burden substantially less speech. The Court recognized that a buffer zone would likely make the Commonwealth's job easier, but "the prime objective of the First Amendment is not efficiency." *Id.* "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* In the absence of that kind of fact-specific showing, the Supreme Court struck down the buffer zone law as insufficiently narrowly tailored under intermediate scrutiny.

#### d. Application of Intermediate Scrutiny to Pittsburgh's Ordinance

As to the government interests at stake in a case like this, all four of the Supreme Court's buffer zone precedents—*Madsen*, *Schenck*, *Hill*, and *McCullen*—accepted that the laws at issue furthered significant government interests. *Schenck* identified those interests as: "protecting a woman's freedom to seek pregnancy-related services, ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting the medical privacy

of patients...." 519 U.S. at 372, 117 S.Ct. 855. Here, the statement of intent of the Pittsburgh City Council asserts the same kinds of justifications: ensuring patients have "unimpeded access to medical services," eliminating the "neglect" of other law enforcement needs, and letting the City provide "a more efficient and wider deployment of its services." Pittsburgh Pa., Code § 623.01. Consistent with *Schenck*, we held in *Brown* that the Ordinance served significant governmental interests. 586 F.3d at 276. Nothing since *Brown* has altered that conclusion. Indeed, *McCullen* noted that such goals reflect "undeniably significant interests," 134 S.Ct. at 2541, and the Plaintiffs in the present case do not dispute the significance of the City's interests.

Nevertheless, the Ordinance must still be narrowly tailored to serve those interests. The District Court, applying intermediate scrutiny (without the benefit of *Reed*), essentially concluded that its analysis was controlled by our narrow-tailoring holding in *Brown*. The Court reasoned that *McCullen* had not "explicitly overrule[d] *Hill* or articulate[d] a deviation from the standard outlined in that case." (App. at 26a.) In the absence of a clear break from precedent, the District Court concluded that it was bound by our prior analysis. In the District Court's view, *McCullen* also did not represent a binding application of the intermediate scrutiny standard because that case involved a thir-

ty-five foot buffer zone and thus imposed a greater "degree of burden" on speech than the fifteen-foot zone in Pittsburgh. (App. at 31a.)

Of course, in a mathematical sense the degree of infringement on the Plaintiffs' speech here is less than that imposed on the petitioners in *McCullen*, fifteen feet being less than thirty-five. But more than math is involved, and, even at fifteen feet, Pittsburgh's buffer zone raises serious questions under the First Amendment. None of the four prior cases assessing buffer zones turned solely on the size of the zones. What matters is the burden on speech that such zones impose, of which size is one but only one feature. Indeed, smaller buffer zones are not always better: *McCullen* struck down a thirty-five foot zone even though *Madsen* had previously upheld a slightly larger zone. *McCullen* never referenced the size of the approved zone in *Madsen* or that the Massachusetts zones were actually smaller. Those cases turned on their distinct factual records, not a simple difference in real estate. *McCullen* emphasized the "serious burdens" that the law imposed on speech by "compromis[ing] petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" 134 S.Ct. at 2535. Any difference between the burden on speech in *McCullen* and that here is a matter of degree rather than kind.[15] Thus, the size of the zone at issue

---

**15.** We agree with the observation of our concurring colleague that the degree of burden on speech here is less than that in *McCullen*, because the zones in Massachusetts were larger, applied state-wide, and limited any entry into the prohibited areas. But the protracted discussion undertaken by the concurrence in an effort to contrast *McCullen* with this case is unnecessary, since the differences do not change the applicable analysis under intermediate scrutiny. As far as we can tell, the concurrence does not contend that those differ-

ences somehow save the Ordinance at issue here from intermediate scrutiny or subject it to a lesser level of review. In fact, our colleague says that he "cannot conclude, on the basis of the allegations in the Complaint, that the Pittsburgh buffer zones operate so differently from the Massachusetts zones that Plaintiffs cannot advance past the pleading stage." (Concurrence at 386.) Because we agree with that statement, we see little point in contrasting the two laws in lengthy dicta. Any law that imposes a similar burden as that in *McCullen*—foreclosing speech about an im-

here is not dispositive, and we must look more broadly at the allegations of the Complaint.

According to those allegations, Pittsburgh's buffer zone Ordinance "prohibits Plaintiffs and others from effectively reaching their intended audience." (App. at 56a.) The Complaint further alleges that "[t]he zones created by the Ordinance make it more difficult [for the] Plaintiffs to engage in sidewalk counseling, prayer, advocacy, and other expressive activities," (App. at 60a), and that the Ordinance "will cause conversations between the Plaintiffs and those entering or exiting the facilities to be far less frequent and far less successful." (App. at 60a.) Taking those allegations as true, the burden on the Plaintiffs' speech is akin to that imposed upon the petitioners in *McCullen*, and nothing in the Complaint suggests otherwise.[16]

■ Because of the significant burden on speech that the Ordinance allegedly imposes, the City has the same obligation to use less restrictive alternatives to its buffer zone as the Commonwealth of Massachusetts had with respect to the buffer zone at issue in *McCullen*. As stated, that obligation requires that the government "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 134 S.Ct. at 2540. The statement of intent of the Pittsburgh City Council—in which the Council stated that Pittsburgh's police had "been consistently called upon in at least two locations within the City to mediate the disputes `.... [causing] indefinite appropriation of policing services," Pittsburgh Pa., Code § 623.01—does not by itself satisfy the required constitutional scrutiny of the Ordinance. Although "we must accord a measure of deference" to the government's judgment, *Hill*, 530 U.S. at 727, 120 S.Ct. 2480, as in *McCullen*, "it is not enough for [the City] simply to say that other approaches have not worked." 134 S.Ct. at 2540. We recognize that the City need not employ "the least restrictive or least intrusive means of serving its interests," *Ward*, 491 U.S. at 798, 109 S.Ct. 2746, but it must, in some meaningful way, "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests," *McCullen*, 134 S.Ct. at 2540. Because the City has available to it the same range of alternatives that *McCullen* identified—anti-obstruction ordinances, criminal en-

portant subject in a quintessential public forum "without seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes," 134 S.Ct. at 2541—is subject to the same narrow tailoring analysis as the Supreme Court employed in that opinion. The concurrence does not deny that Pittsburgh's Ordinance is such a law. We are simply following where *McCullen* has led.

16. The concurrence offers some suppositions about the possible ways the Ordinance might affect people, like Plaintiffs, engaging in sidewalk counseling. For example, it notes that counselors will likely be able to distinguish patients from passersby because "[a] patient heading toward a clinic will almost certainly have manifested her intention to enter the clinic by the time she is 15 feet from its entrance" (Concurrence at 384), even though the photograph of the Planned Parenthood buffer zone provided by the City shows that it extends to the edge of the sidewalk and into the street, which would seemingly make it quite difficult for counselors to make any distinction between patients walking into the clinic and pedestrians walking by it. Despite the guesswork, the concurrence concludes by emphasizing that, "it is not the Court's role on a 12(b)(6) motion to supplant the well-pleaded allegations with its own speculation, or to question the Plaintiffs' characterization of their experiences." (Concurrence at 385.) That last observation is certainly correct, which is why we have opted not to speculate or question the allegations of the Complaint.

forcement, and targeted injunctions—it must justify its choice to adopt the Ordinance. To do so, the City would have to show either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason.[17]

By that statement, we do not suggest that the City must demonstrate that it has used the least-restrictive alternative, nor do we propose that the City demonstrate it has tried or considered *every* less burdensome alternative to its Ordinance. *See Ward*, 491 U.S. at 800, 109 S.Ct. 2746 (concluding that "[t]he Court of Appeals erred in sifting through all the available or imagined alternative means of regulating sound volume in order to determine whether the city's solution was the least intrusive means of achieving the desired end" (internal quotation marks omitted)). On the contrary, analysis under intermediate scrutiny affords some deference to a municipality's judgment in adopting a content-neutral restriction on speech.[18] But

---

**17.** The concurrence repeatedly tries to downplay the significance of *McCullen*—variously referring to the opinion as "incremental," "modest," and "unexceptional" (Concurrence at 377)—and devotes much of its energy to narrowing that case only to its facts. It does so, presumably, in service of a desire to avoid the import of the Supreme Court's decision. Consider our colleague's reading of *McCullen*: "[u]nlike the majority, I do not believe that *McCullen* announces a general rule requiring the government to affirmatively prove that less-restrictive measures would fail to achieve its interests." (Concurrence at 376.) Then try to reconcile that with the actual language of *McCullen*: "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." 134 S.Ct. at 2540. We are more ready than our colleague is to take the high Court at its word, and that is the heart of our disagreement with him.

Nevertheless, he asserts that our analysis "is contrary to *McCullen* and distorts First Amendment doctrine." (Concurrence at 378.) Far from it. We are doing nothing more than applying *McCullen* according to its terms. In the unanimous language of the Supreme Court, "it is not enough for [the government] simply to say that other approaches have not worked." *Id.* Again, the burden is on the government to actually demonstrate that alternative measures would fail to meet the government's legitimate ends. We are simply holding the City to that standard, as was done in *McCullen*.

The concurrence claims that we have neglected to answer "the central constitutional question: assuming that the proposed alternatives would burden less speech than a 15-foot buffer zone, would they burden *substantially* less speech?" (Concurrence at 381.) But *McCullen* answered that question for us; it just did not provide the answer our concurring colleague might prefer. In that opinion, the Supreme Court laid out some of the less-burdensome alternatives to a buffer zone law. Because the burden on Plaintiffs' speech here is akin to that present in *McCullen*, the City similarly "has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." 134 S.Ct. at 2539. The existence of those substantially less burdensome alternatives obligates the City to try them or consider them. Again, that is not our requirement. It is the Supreme Court's: "the Commonwealth has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it. Nor has it shown that it considered different methods that other jurisdictions have found effective." *Id.* Our analysis here is not nearly the novelty that the concurrence suggests. This case calls for nothing more than a straightforward application of *McCullen*—the Ordinance imposes the same kind of burden on speech, the same less burdensome options are available, and the City has similarly failed to try or to consider those alternatives to justify its Ordinance.

**18.** Despite our repeated recognition of the broad principle of deference to legislative judgments and our explicit assurance that legislatures need not meticulously vet every less burdensome alternative, the concurrence nonetheless persists in suggesting that we are somehow saying the opposite, "eliminat[ing] much of the discretion" given to lawmakers

the municipality may not forego a range of alternatives—which would burden substantially less expression than a blanket prohibition on Plaintiffs' speech in a historically-public forum—without a meaningful record demonstrating that those options would fail to alleviate the problems meant to be addressed. Properly crediting the allegations of the Complaint, Pittsburgh has not met that burden.

Of course, the City had no opportunity to properly produce such evidence at the motion-to-dismiss stage. Instead, we must accept as true at this stage of the case the Complaint's allegation that "no specific instances of obstructive conduct outside of hospitals or health care facilities in the City of Pittsburgh ... provide support for the law ...." (App. at 56a.)[19] The Plaintiffs

further claim that "[n]o speech activities on the public sidewalks and ways outside the Liberty Avenue Planned Parenthood in recent years have caused a problem preventing access to its entrances." (App. at 57a.) Again, these assertions must be credited at this stage. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

*McCullen* required the sovereign to justify its regulation of political speech by describing the efforts it had made to address the government interests at stake by substantially less-restrictive methods or by showing that it seriously considered and reasonably rejected "different methods that other jurisdictions have found effective." 134 S.Ct. at 2539. Such proof can only be considered, however, after a fair opportunity for discovery and the produc-

and "requiring governments to adopt the least restrictive alternative." (Concurrence at 380.) Both fears are unfounded. We can only say what we have repeatedly said elsewhere in this opinion: we are imposing neither requirement. All we can do to allay the concurrence's concerns, we surmise, is to emphasize that we mean what we say.

The concurrence similarly claims that we are conducting an unprecedented "show us your work" review of the underlying legislative record, "something no court has ever required." (Concurrence at 379.) Although we (yet again) acknowledge the need for deference, heightened scrutiny must mean *something*. It is impossible to read *McCullen* any other way. That case dug into the record, discussed the substantially less burdensome alternatives available, and assessed the Commonwealth's failure to use those alternatives to address its significant interests. And that was not a novel approach. Past intermediate scrutiny cases engage in similar review of the legislative record. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 211, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (assessing "must carry" provision by scrutinizing the legislative record, and ultimately asking "whether the legislative conclusion was reasonable and *supported by substantial evidence in the record before Congress*" (emphasis added)); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41,

50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (examining the legislative record supporting the City of Renton's adoption of its ordinance prohibiting adult movie theaters within 1,000 feet of residential areas); *see also United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (striking down content-based restriction on speech, under strict scrutiny, citing the "near barren legislative record relevant to th[at] provision"). The government bears the burden to establish the reasonable fit between the challenged law and its asserted objective. *Bd. of Trs. of State. Univ. of N.Y. v. Fox*, 492 U.S. 469, 480–81, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). That burden—and the protection of speech that heightened judicial scrutiny is meant to ensure—would be meaningless indeed if it did not ask the government, at the very least, to justify its choice to prohibit speech where substantially less burdensome alternatives are available.

19. One might argue that the qualifying phrase "provide support for the law" makes that allegation primarily a legal rather than a factual contention. *See Fowler*, 578 F.3d at 210–11 (holding that a court presented with a motion to dismiss "may disregard any legal conclusions" set out in the complaint). Viewing it generously for the Plaintiffs, however, we will take it to mean that no meaningful obstruction has occurred.

tion of evidence. Indeed, when a complaint states a plausible First Amendment claim of the type advanced here and substantially less burdensome alternatives appear to have been available to the city or state, the city or state will rarely be able to satisfy narrow tailoring at the pleading stage.[20] At this early point in the present case, without such proof, the Plaintiffs' First Amendment claims cannot be dismissed. We instead must credit the allegations of the Complaint, which plausibly state a claim that the City's Ordinance "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 134 S.Ct. at 2535 (internal quotation marks omitted).

The City contends, consistent with the District Court's opinion, that *McCullen* did not alter the narrow-tailoring analysis to the degree necessary to change the conclusion we reached in *Brown*. But *McCullen* employs a level of rigor that *Brown* did not approach. In fact, *Brown* engaged in no narrow-tailoring analysis of its own. It instead incorporated the analyses of *Madsen* and *Schenck* by reference and concluded that Pittsburgh's buffer zone was "*a fortiori* constitutionally valid" in light of those past cases. *Brown*, 586 F.3d at 276. At the very least, *McCullen* has called that approach into question, clarifying that the particular facts of each case must be examined.[21] No buffer zone can be upheld *a fortiori* simply because a similar one was deemed constitutional, since the background facts associated with the creation and enforcement of a zone cannot be assumed to be identical with those of an earlier case, even if the ordinances in the two cases happened to be the same.

*McCullen* made this evident when it struck down a smaller buffer zone than that which was upheld in *Madsen*. Also, both *Madsen* and *Schenck* involved plaintiff-specific injunctions, which is one of the less-restrictive alternatives identified by *McCullen* that a sovereign should utilize before turning to "broad, prophylactic measures" like generally-applicable buffer zones that "unnecessarily sweep[ ] in innocent individuals and their speech." *McCullen*, 134 S.Ct. at 2538. And it may be noteworthy that *Brown* considered its narrow-tailoring conclusion to be "bolstered" by the First Circuit's opinion in *McCullen*, which was the very decision later reversed by the Supreme Court. *Brown*, 586 F.3d at 276.

*McCullen* represents an important clarification of the rigorous and fact-intensive nature of intermediate scrutiny's narrow-tailoring analysis, and the decision is sufficient to call into question our conclusion in

20. Although this is not such a case, there may be cases in which it is clear—before any evidence is produced regarding the government's history of attempting and considering alternatives—that the chosen regulation is reasonably narrowly tailored under intermediate scrutiny. For example, were one to challenge the hypothetical *de minimis* sound amplification law posited by the concurrence, that regulation would likely be viewed as narrowly tailored, even at the pleading stage. With such a slight burden on speech, any challengers would struggle to show that "alternative measures [would] burden *substantially* less speech." *McCullen*, 134 S.Ct. at 2540 (emphasis added).

We also note that our emphasis on the need for the development of a factual record arises not only from the general principle that a court should have a sufficient basis to support its legal conclusions but more particularly from the Supreme Court's instruction in *McCullen* on the importance of a factual record in considering the constitutionality of such buffer zone laws.

21. In this way, we entirely agree with the concurrence's observation that *McCullen* requires that courts may no longer hold "that a speech regulation is constitutional if it is facially similar to a restriction upheld in a prior Supreme Court case." (Concurrence at 377.)

*Brown. See In re Krebs*, 527 F.3d 82, 84 (3d Cir. 2008) ("A panel of this Court may reevaluate the holding of a prior panel which conflicts with intervening Supreme Court precedent."). The recent instruction from *McCullen* and the factual allegations of the Complaint combine to require that we vacate the District Court's grant of the City's motion to dismiss the Plaintiffs' free speech claims. Because the Plaintiffs' Complaint should not have been dismissed, the District Court's improper consideration of materials beyond the pleadings to convert the motion to one for summary judgment cannot be treated as harmless error.

### 2. Free Press Claim

The Plaintiffs also raise a claim under the Freedom of the Press Clause of the First Amendment, because "the Ordinance prohibits them from leafleting on public sidewalks." (Opening Br. at 37.) The District Court did not directly address that aspect of the Plaintiffs' First Amendment claim, instead dismissing the facial challenge in its entirety. On appeal, the City argues that the free press claim "properly fell along with the rest of the First Amendment claim under the district court's analysis." (Appellee's Br. at 42 n.4.)

The City's contention is correct in the abstract. Had the District Court properly dismissed the Plaintiffs' free speech claim, it would also have been proper to dismiss their free press claim, because the Plaintiffs' free press claim is, in this context, properly considered a subset of their broader free speech claim, given that the Freedom of the Press Clause and the Free Speech Clause both protect leafleting from government interference. *See Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938) ("The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets."); *McIntyre v.*

*Ohio Elections Comm'n*, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) ("[T]he speech in which Mrs. McIntyre engaged—handing out leaflets in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression.").

But as the claims could properly fall together, the converse is also true here: resuscitation of the broader free speech claim requires us to vacate the dismissal of the free press claim. In light of the burden the Ordinance places on speech, the City's inability to show at the motion to dismiss stage that substantially less burdensome alternatives would fail to achieve its interests dooms its broad prohibition on all of the Plaintiffs' expressive activities, including the prohibition on leafleting.

### 3. Overbreadth Claim

The Plaintiffs next contend that the Ordinance violates the First Amendment by imposing an unconstitutionally overbroad restriction on speech "because it authorizes the creation of zones at non-abortion locations where the City does not even claim there has been a justification for banning speech." (Opening Br. at 38.) The City responds—just as the District Court did in dismissing this claim—that their argument is "foreclosed by this Court's decision in *Brown*." (Answering Br. at 42.) In *Brown*, we rejected the plaintiff's facial overbreadth challenge because such a claim was undercut by *Hill*. 586 F.3d at 282–83 n. 21. *Hill* involved a floating bubble zone that applied, like Pittsburgh's Ordinance, to "any health care facility." *Hill*, 530 U.S. at 707, 120 S.Ct. 2480. Despite that, the Supreme Court upheld the statute against a facial challenge to its overbreadth. *Id.* at 730–32, 120 S.Ct. 2480. "The fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional

significance," the Court noted. *Id.* at 730–31, 120 S.Ct. 2480. In fact, said the Court, "the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." *Id.* at 731, 120 S.Ct. 2480.

Like the statute at issue in *Hill*, a buffer zone under the Ordinance can be established at any "hospital, medical office or clinic. . . ." (App. at 150a.) But the Plaintiffs' Complaint alleges that the Ordinance "is only enforced outside of health care facilities which provide abortions" (App. at 56a); the entirety of the discussion of the Ordinance's enforcement in the Complaint relates to a single Planned Parenthood location.

The *McCullen* Court did address the breadth of the Massachusetts buffer zone statute, but it did so only in the context of its free speech analysis and discussion of the disconnect between the government interests at stake and the means through which it sought to vindicate those interests. *McCullen*, 134 S.Ct. at 2539 (noting that interests pertaining "mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings" do not require "creating 35–foot buffer zones at every clinic across the Commonwealth"). Given its holding striking down the law, *McCullen* explicitly did not reach the petitioners' overbreadth challenge. *Id.* at 2540 n. 9.

■ We think it unwise for us to assess the proper scope of the City's Ordinance without there first being a resolution of the merits of the Plaintiffs' free speech claim. It is true that the breadth of the challenged law plays a role in the narrow-tailoring analysis of the Plaintiffs' free speech claim. *See Brown*, 586 F.3d at 273 n. 10 ("What the petitioners classified as an 'overbreadth' problem, in other words, was better understood analytically as a concern to be addressed within the framework of . . . [a] narrow-tailoring test."); *McCullen*, 134 S.Ct. at 2539 (comparing breadth of statute against government interest in striking down statute on narrow-tailoring grounds). But we cannot adequately assess the overbreadth argument absent a well-supported conclusion regarding the proper scope of the Ordinance. "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473, 130 S.Ct. 1577 (internal quotation marks omitted). Without the developed factual record that *McCullen* requires, we do not know the "legitimate sweep" of the buffer zone law, and thus whether it substantially exceeds that sweep. As with the Plaintiffs' other First Amendment claims, it is premature to dismiss their overbreadth challenge. Accordingly, we will reverse the District Court's dismissal of the overbreadth claim.

### 4. Due Process Claim

■ Finally, the Plaintiffs maintain that the Ordinance violates the Due Process Clause of the Fourteenth Amendment because it "vests unbridled discretion in the City to create buffer zones outside of any hospital or health care facility in the City of Pittsburgh." (Opening Br. at 42.) The District Court dismissed that claim because the substance of the claim is "more appropriately characterized as violations under the First Amendment." (App. at 39a.)

■ The District Court properly pointed out that all of the precedents cited by the Plaintiffs involved First Amendment claims. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of

'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (internal quotation marks omitted). Any concerns about the exercise of discretion vested in City officials can be addressed in an as-applied challenge to the Ordinance's enforcement under the First Amendment.[22] We thus agree with the District Court that "[t]he First Amendment is the proper constitutional home for Plaintiffs' freedom of speech and press claims...." (App. at 37a.) Accordingly, we will affirm the District Court's dismissal of the Plaintiffs' Due Process claim.[23]

## III. CONCLUSION

For the foregoing reasons, we will vacate the District Court's dismissal of the Plaintiffs' First Amendment claims and affirm the dismissal of their Due Process claim. Again, nothing in this opinion should be construed as a conclusion about the ultimate merits of the claims or defenses advanced by the parties. There are not enough facts in the record for us to make any such comment, even were we so inclined. That is the problem. We reverse so that the Plaintiffs' claims may be aired and assessed by the standard that *McCullen* now requires.

FUENTES, Circuit Judge, concurring in the judgment.

I agree with the majority that the allegations in the Complaint, taken as true, establish that Pittsburgh's Ordinance restricting certain speech within 15 feet of designated health care facilities violates the intermediate-scrutiny standard for time, place, and manner regulations. I disagree, however, with the majority's reasoning in support of that result. In particular, I disagree with its conclusion that the Supreme Court's decision in *McCullen v. Coakley*[1] requires governments that place "significant" burdens on speech to prove either that less speech-restrictive measures have failed or that alternative measures were "seriously" considered and "reasonably" rejected. That interpretation distorts narrow-tailoring doctrine by eliminating the government's latitude to adopt regulations that are not "the least restrictive or least intrusive means of serving the government's interests."[2] Nothing in *McCullen* or the Supreme Court's First Amendment jurisprudence requires us to apply such a rule. Accordingly, as to Plaintiffs' free-speech claim, I concur only in the judgment.[3]

## I.

My disagreement with the majority stems entirely from our differing interpre-

---

**22.** In granting the parties' motion to voluntarily dismiss with prejudice the as-applied challenges, the District Court's order noted: "The parties specify that dismissal is with prejudice to these two existing matters, but the prejudice does not prevent assertion of such claims against future applications of the ordinance by the City." (District Court Docket, Doc. 31.)

**23.** Although the Plaintiffs also raised a procedural due process claim, which the District Court dismissed, they have made no argument before us concerning that claim. Accordingly, any argument supporting the procedural due process claim is waived. *See*

*United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.").

**1.** —— U.S. ——, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014).

**2.** *Id.* at 2535 (internal quotation marks omitted).

**3.** I agree with the majority's disposition of Plaintiffs' free press, overbreadth, and due process claims.

tations of *McCullen.* Unlike the majority, I do not believe that *McCullen* announces a general rule requiring the government to affirmatively prove that less-restrictive measures would fail to achieve its interests. Before addressing the source of this disagreement, therefore, I think it is useful to review *McCullen* and to situate it among the Supreme Court's narrow-tailoring and abortion-protest precedents.

*McCullen* is, first and foremost, a straightforward application of the *Ward* narrow-tailoring standard for time, place, and manner regulations. Such regulations "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"[4] But the regulation "'need not be the least restrictive or least intrusive means of' serving the government's interests."[5] The ultimate question is whether the government has achieved an appropriate "balance between the affected speech and the governmental interests that the ordinance purports to serve."[6]

*McCullen* was a case of extreme imbalance—so much so that the Supreme Court unanimously agreed that the challenged statute failed narrow tailoring. The Massachusetts law at issue imposed remarkably onerous burdens on speakers, prohibiting all speech by all non-exempt persons in a 35–foot section of the public way at all abortion clinics in the entire state of Massachusetts.[7] As the Supreme Court recognized, "closing a *substantial* portion of a traditional public forum to *all* speakers" is an "extreme step."[8] Likewise, "categorically exclud[ing] non-exempt individuals" from particular zones was certain to "unnecessarily sweep in innocent individuals and their speech."[9] And the risks were not simply hypothetical. Based on the record, the Court concluded that the Massachusetts buffer zones "impose[d] *serious* burdens on petitioners' speech" and "carve[d] out a *significant* portion of the adjacent public sidewalks, pushing petitioners *well back* from the clinics' entrances and driveways."[10]

The Massachusetts law also departed significantly from the regulations upheld in the Supreme Court's prior abortion-protest cases. Unlike the injunctions in *Madsen v. Women's Health Center, Inc.*[11] and *Schenck v. Pro–Choice Network of Western N.Y.*,[12] which were targeted at specific defendants in specific locations, the Massachusetts law prohibited speech by all persons at all abortion clinics throughout the state. Unlike the so-called "bubble zones" in *Hill v. Colorado*,[13] the Massachusetts law forbade speakers from even standing in the buffer zone, thereby foreclosing leafletting or consensual conversations within the zone. And it did so by cordoning off an entire portion of the public forum to all speakers and all messages.

---

4. *McCullen,* 134 S.Ct. at 2535 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

5. *Id.* at 2535 (quoting *Ward,* 491 U.S. at 798, 109 S.Ct. 2746).

6. *Watchtower Bible & Tract Soc. of N.Y., Inc. v. Village of Stratton,* 536 U.S. 150, 165, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002).

7. *McCullen,* 134 S.Ct. at 2526.

8. *Id.* at 2541 (emphasis added).

9. *Id.* at 2538.

10. *Id.* at 2537–38 (emphasis added).

11. 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).

12. 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997).

13. 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

The fact that the Massachusetts law imposed "truly exceptional" burdens on speakers also naturally suggested that Massachusetts had "too readily forgone options that could serve its interests just as well." [14] The Court proposed a number of less-intrusive alternatives: access problems could be addressed through a law that prohibited deliberate obstruction of clinic entrances; harassment could be addressed by an ordinance like the one adopted in New York City that makes it a crime "to follow and harass another person within 15 feet of the premises of a reproductive health care facility"; and targeted injunctions could be used against particularly troublesome individuals.[15] But because Massachusetts could not identify a single prosecution brought under the other laws at its disposal, it could not show "that it seriously undertook to address the problem with less intrusive tools readily available .to it." [16] The Court concluded that Massachusetts could not enact such an extreme speech prohibition without offering a correspondingly comprehensive justification.

*McCullen,* fairly read, represents an incremental advance in narrow-tailoring doctrine. As the majority implicitly recognizes, *McCullen* did not alter the substantive standard for time, place, and manner restrictions. What it did, rather, is direct courts toward a more nuanced mode of narrow-tailoring analysis. It is no longer enough to say, as we did in *Brown v. City of Pittsburgh,*[17] that a speech regulation is constitutional. if it is facially similar to a restriction upheld in a prior Supreme Court case. Instead, courts must scrutinize the practical operation of the regula-

tion at issue, including its effects on particular types of messaging (*e.g.,* sidewalk counseling and handbilling), the degree to which it privileges ease of enforcement rather than legitimate public access interests, and, in appropriate cases, the availability of less burdensome alternatives. Such scrutiny is especially warranted where, as in *McCullen,* the government enacts a blanket prohibition to address a localized problem.

These are modest, commonsense propositions. Notably, not a single Supreme Court justice considered *McCullen*'s narrow-tailoring analysis worthy of dissent or separate comment—a remarkable consensus in a case pitting abortion-access interests against the right to free speech. That unanimity is not surprising in light of the extreme facts presented and the straightforward doctrinal analysis required. *McCullen,* when read against its precedents, is best understood as a boundary-setting exercise—a corrective but ultimately unexceptional exposition of narrow-tailoring doctrine.

## II.

The majority reads *McCullen* differently. *McCullen,* it says, announces a new rule: henceforth, the government must justify any law that places a "significant" burden on speech "by describing the efforts it ha[s] made to address the government interests at stake by substantially less-restrictive methods or by showing that it seriously considered and reasonably rejected 'different methods that other jurisdictions have found effective.'" [18] Applying

---

14. *McCullen,* 134 S.Ct. at 2537.

15. *Id.* at 2537–39.

16. *Id.* at 2539.

17. 586 F.3d 263 (3d Cir. 2009).

18. Maj. Op. 367, 371 (quoting *McCullen,* 134 S.Ct. at 2539.) As the majority acknowledges, the rule it announces today applies only to laws, like the .buffer zone in *McCullen,* that place a "significant burden on speech." *Id.* 367. The rule does not apply in the mine run

the rule to this case, the majority states that the City "has the same obligation to use less restrictive alternatives ... as the Commonwealth of Massachusetts had with respect to the buffer zone at issue in *McCullen*." [19] Therefore, regardless of any differences in size and prohibited conduct between the Massachusetts buffer zones and the City's buffer zones, the Ordinance is flatly unconstitutional unless the City can "show either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason." [20] The majority acknowledges that under this rule, "dismissal of claims challenging ordinances like the one at issue here will rarely, if ever, be appropriate at the pleading stage." [21] But "without such proof, the Plaintiffs' First Amendment claims cannot be dismissed." [22]

I believe that the majority's new "proof of prior efforts" rule is contrary to *McCullen* and distorts First Amendment doctrine. It is, of course, indisputably true that under *McCullen*, the government cannot take "the *extreme* step of closing a *substantial portion* of a traditional public forum to *all* speakers" without "seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes." [23] But that is not the same thing as saying that *every* "significant" time, place, and manner law—or even every buffer zone—must be supported by evidence that the government vetted less-restrictive alternatives prior to the law's adoption, regardless of the burden the law actually places on speech. Such a rule stretches *McCullen* too far, risks untoward results, and disregards *McCullen*'s express statement that a regulation—even one that places "significant" burdens on speech—need not be the least restrictive or least intrusive means of serving the government's interests.

Contrary to the majority's reading, *McCullen*'s invocation of less-restrictive alternatives did not break new ground in First Amendment doctrine. The burden is always on the government to prove that a time, place, or manner restriction does not "burden substantially more speech than is necessary to further the government's legitimate interests." [24] A necessary part of that inquiry is whether there are less-restrictive alternatives that could meet the government's interests. [25] It is therefore

---

of cases involving ordinary or *de minimis* time, place, and manner restrictions. *Id.* 372 n. 20.

An example may illustrate the distinction. Imagine that a beach town adopts a *de minimis* time, place and manner restriction: no person may use an electronic sound-amplification device on the beach between the hours of 1:00 a.m. and 6:00 a.m. Under today's decision, this law should be upheld simply because it hardly burdens any speech, and certainly does not burden more speech than necessary to achieve the government's interests. The town government need not prove either that it attempted or that it seriously considered and reasonably rejected less restrictive alternatives, such as a law saying no amplification devices between 2:00 a.m. and 5:00 a.m., or a law saying no amplification devices within 100 feet of a beachfront resi-

dence, or a law saying no amplifiers above 50 watts.

19. Maj. Op. 369.

20. Maj. Op. 370.

21. Maj. Op. 357.

22. Maj. Op. 372.

23. *McCullen*, 134 S.Ct. at 2541 (emphasis added).

24. *Ward*, 491 U.S. at 799, 109 S.Ct. 2746.

25. *See 44 Liquormart v. Rhode Island*, 517 U.S. 484, 529, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) ("The availability of less burdensome alternatives to reach the stated ·goal signals that the fit between the legislature's

unexceptional to say, as the Court did in *McCullen*, that "the government must demonstrate that alternative measures that ·burden substantially less speech would fail to achieve the government's interests." [26] If the government's needs could be met by alternatives that "burden substantially less speech," then the challenged regulation *ipso facto* "burdens substantially more speech than is necessary." But the adverb supplies the test: the operative · question, in this case and others, is whether the proposed alternatives would burden *substantially* less speech while still furthering the government's interests. In practice, this means that a city faced with a range of possible solutions to a public nuisance is free to reject less-burdensome options, so long as it does not reject viable options that would burden *substantially* less speech.

The majority opinion grafts an additional requirement onto the "substantially more speech than necessary" test: a municipality must now also prove that, before adopting a regulation that "significantly" burdens speech, it either attempted or "seriously considered" and "reasonably rejected" less-intrusive alternatives. This rule improperly elevates one element of the narrow-tailoring inquiry—the availability of less-burdensome alternatives—into a standalone rule of constitutionality. And it does so by converting our inquiry from an after-the-fact assessment of the burdens and benefits of a regulation (what *McCullen* actually requires) into a review of the sufficiency of the underlying legislative record (something no court has ever required). I see no reason why we should begin conducting judicial audits of the legislative rulemaking process.[27] As *McCullen*

ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny." (O'Connor, J. concurring)).

**26.** 134 S.Ct. at 2540. It also seems implausible that the Supreme Court would choose to announce a new, standalone First Amendment tailoring rule in the middle of a paragraph at the end of an opinion section devoted to rejecting a party's arguments.

**27.** Note the fundamental oddity of today's rule, which essentially requires legislatures to "show us their work" and prove that they took certain considerations into account during the rulemaking process. We frequently assess speech statutes by asking what problem the statute was meant to solve and how well it does so in practice. And as the majority notes, we will sometimes review the legislative record when deference requires us to assess whether Congress acted reasonably, *see Turner Broad. Sys. v. FCC*, 520 U.S. 180, 195–96, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), or when determining whether the government's justification for a regulation is purely speculative, *see City of Renton v. Playtime Theatres*, 475 U.S. 41, 50–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). But I am unaware of

any First Amendment context in which we affirmatively require a legislative body to produce a record of its underlying decisionmaking processes, and then base our constitutional determination on whether the legislature crossed off each item on a prescribed factfinding checklist before it enacted the rule in question. Intermediate scrutiny requires us to defer to a legislature's judgments, not dictate its rulemaking procedures. *See Turner Broad. Sys.*, 520 U.S. at 218, 117 S.Ct. 1174 ("It is well established a regulation's validity does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.") (internal quotation omitted); *City of Renton*, 475 U.S. at 50–52, 106 S.Ct. 925 (cities enacting time, place, and manner regulations need not produce evidence specifically relating to the city's problems or needs and may instead rely on the experiences of other cities).

The novelty of this type of constitutional review raises a variety of practical questions, none of which are answered in the majority opinion. For starters: How can a government ever determine, prior to legislating, which alternatives it must "seriously consider"? What constitutes a "reasoned" rejec- · tion? When a government legislates to ad-

makes clear, the constitutionality of a speech regulation depends on its scope and its effects, not on whether whether the legislative body satisfied some indeterminate set of preconditions before it began drafting. The Supreme Court's time, place, and manner jurisprudence is concerned with outcomes rather than procedure.

By extending judicial scrutiny to the legislative process itself, the majority's new tailoring standard improperly eliminates much of the discretion that *Ward* and *McCullen* confer on municipal decisionmakers.[28] *Ward* tells municipalities that they need not entertain every conceivable less-intrusive alternative before adopting a speech law, because hypothetical regulations that would not burden substantially less speech than the chosen option are irrelevant to the First Amendment calculus.[29] Today's opinion, by contrast, tells municipalities not only that they must entertain such alternatives, but that they must also prepare a record demonstrating that they "seriously considered" and "reasonably rejected" such alternatives during the rulemaking process.

Similarly, *Ward* directs courts not to "sift[ ] through all the available or imagined alternative means of regulating" a given activity to "determine whether the city's solution was 'the least intrusive means' of achieving the desired end."[30] Today's decision requires courts to sift through the available or imagined alternatives to a challenged regulation and determine whether the city "reasonably rejected" each one. This approach would be understandable if *McCullen* had disavowed or limited *Ward*. But *McCullen* expressly follows *Ward* and preserves government discretion by reaffirming that a time, place, and manner regulation " 'need not be the least restrictive or least intrusive means of' serving the government's interests."[31] Here, a rule that strikes down speech laws whenever the government cannot justify the non-adoption of less-restrictive alternatives treads impermissibly close to a rule requiring governments to adopt the least restrictive alternative.

Today's opinion also introduces a fundamental inconsistency into our narrow-tai-

---

dress a new problem (*i.e.*, in the absence of practical enforcement experience), what weight should courts give to predictive judgments about the drawbacks or benefits of a rejected proposal? How, if at all, does the "seriously considered/reasonably rejected" standard incorporate the Supreme Court's instruction in *Hill*, 530 U.S. at 727, 120 S.Ct. 2480, that we must "accord a measure of deference" to the legislature's judgment regarding how best to accommodate competing interests? Can a government "reasonably reject" a viable alternative that would burden substantially less speech than the chosen option?

The majority leaves these questions to future courts. In light of the novelty of the required inquiry and the fact that most (if not all) municipal time, place, and manner restrictions are not supported by the type of factual record today's decision requires, it is worth reemphasizing that the majority's rule only applies to laws that place *significant* burdens on speech. In the vast majority of

cases, litigants and District Courts need not consult legislative history or grapple with the questions raised here.

**28.** *See also Hill*, 530 U.S. at 727, 120 S.Ct. 2480 (courts evaluating whether a speech restriction "is the best possible accommodation of the competing interests at stake" must "accord a measure of deference" to the legislature's judgment).

**29.** *See Ward*, 491 U.S. at 797, 109 S.Ct. 2746 ("[R]estrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.' ") (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

**30.** *Ward*, 491 U.S. at 797, 109 S.Ct. 2746.

**31.** *McCullen*, 134 S.Ct. at 2535 (quoting *Ward*, 491 U.S. at 798, 109 S.Ct. 2746).

loring doctrine. *McCullen* and its predecessors establish that any time, place and manner regulation is constitutional so long as it does not burden substantially more speech than necessary to achieve the government's aims. The majority's new rule bypasses this inquiry in cases of "significant" burden and instead mandates a finding of unconstitutionality whenever the government cannot prove that it tried, properly considered, or reasonably rejected less-restrictive alternatives. This means that even if a regulation objectively does not burden substantially more speech than necessary, it will *still* be unconstitutional if the government cannot prove that it engaged in the prescribed factfinding. But this is not how narrow tailoring works. Under *McCullen* and its predecessors, a regulation can be perfectly constitutional even if the government has no record of how it arrived at its rulemaking, so long as the regulation does not burden substantially more speech than necessary to serve a legitimate government interest.[32] The lack of such a record may be relevant to the narrow-tailoring analysis, for all the reasons explained in *McCullen*—but it is not dispositive.

This case illustrates my concern. The majority holds that the plaintiffs have successfully pleaded a constitutional violation because (1) the City has available to it less-restrictive alternatives such as "anti-obstruction ordinances, criminal enforcement, and targeted injunctions," and (2) the City has failed to try such measures or to justify its decision not to adopt them.[33] But this approach fails to address the central constitutional question: assuming that the proposed alternatives would burden less speech than a 15–foot buffer zone, would they burden *substantially* less speech?[34] Or do they fall within the range of slightly less burdensome restrictions that the City remains free to reject out of hand because it is not obligated to choose the least restrictive alternative? To answer, we would need to assess the actual burden imposed by the Ordinance; how much less burdensome the proposed alternatives would be; and how likely it is that the proposed alternatives would meet the City's legitimate interests. The majority's *per se* proof rule skips over this analysis and proceeds straight to the outcome.

To the extent the majority reads *McCullen* as adopting a special rule for buffer zones, that distinction does not appear on the face of the *McCullen* opinion or follow naturally from the Supreme Court's reasoning. As the majority recognizes elsewhere, what *McCullen* actually demands is a nuanced tailoring analysis that accounts for context and practical consequences—not a rigid new tier of scrutiny for statutes that create physical zones of exclusion. After all, every time the government builds a fountain in a public park or installs a planter on the sidewalk, it is technically "carving out" a piece of the public forum and preventing its use as a site for expression. We may safely assume that the Supreme Court did not intend such projects to be unconstitutional unless a city can prove that smaller fountains and planters cannot meet the city's beautification

---

**32.** The inverse also holds true: if a law burdens substantially more speech than necessary to achieve the government's interests, it should be declared unconstitutional regardless of the government's proffered justification.

**33.** Maj. Op. 369–70.

**34.** As explained in Section III, *infra*, the Pittsburgh buffer zone at issue here burdens far less speech than the Massachusetts zone in *McCullen*. Therefore, we cannot simply assume that the alternative measures discussed in the *McCullen* opinion would also burden substantially less speech than the Pittsburgh Ordinance.

needs. But I am also confident that the *McCullen* Court did not intend to require courts to develop a special body of jurisprudence to deal with such questions.

In short, nothing in *McCullen* or its antecedents requires courts to strike down a time, place, and manner restriction whenever the government cannot prove that it tried or seriously considered less intrusive measures. Narrow tailoring permits a fit between the legislature's goal and method "that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." [35] Plaintiffs will always be able to conceive and plead less burdensome alternatives to a given regulation. Forcing the government to identify those alternatives and affirmatively disprove their viability prior to legislating would convert narrow tailoring from a "reasonable fit" requirement to a "perfect fit" requirement. The availability of less-burdensome alternatives is relevant only to the extent it informs the ultimate question: whether the regulation " 'burden[s] *substantially* more speech than is necessary to further the government's legitimate interests.' " [36] That standard, rather than the majority's inflexible "proof of prior efforts" rule, should govern the outcome of this case.

### III.

Plaintiffs' invocation of less-intrusive alternatives therefore does not resolve this case. We still must ask: under the fact-specific tailoring analysis required by *McCullen*, does the Pittsburgh Ordinance burden substantially more speech than is necessary to further the City's legitimate interests in protecting women's access to pregnancy-related services, ensuring public safety, and promoting the free flow of traffic? The majority says "yes," in part because it views the burdens imposed by the Ordinance as functionally indistinguishable from the burdens imposed by the Massachusetts law in *McCullen*. I am less certain. While I ultimately agree that the Plaintiffs have adequately pleaded a First Amendment violation, there are numerous distinctions between the buffer zones in *McCullen* and the buffer zones in this case. These distinctions demonstrate why this case cannot be decided simply by citing the prospect of less-burdensome alternatives.

*Size of the Zones.* The most obvious difference between the Pittsburgh buffer zones and the *McCullen* buffer zones is their size. The radius of the Pittsburgh buffer is less than half the radius of the Massachusetts buffer, and creates a zone whose total area is less than one-fifth the area of the Massachusetts zone. (Put differently, the Massachusetts zone was 2.3 times longer, and its total area was 5.4 times larger.) The Pittsburgh Ordinance therefore carves out a substantially smaller piece of the public forum.[37] I agree with the majority that size alone is not dispositive, and that what ultimately matters is "the burden on speech that such zones impose." [38] But when the regulation in question enforces physical distances be-

---

**35.** *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989).

**36.** *McCullen*, 134 S.Ct. at 2535 (emphasis added) (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. 2746).

**37.** *Cf. McCullen*, 134 S.Ct. at 2535 (the Massachusetts zones "carve out a significant portion of the adjacent public sidewalks"); *id.* at 2541 (Massachusetts has taken "the extreme step of closing a substantial portion of a traditional public forum to all speakers").

**38.** Maj. Op. 368.

tween speakers and listeners, the distance *is* the burden. And there is reason to think that the difference in size between the Massachusetts and Pittsburgh zones is constitutionally significant.

The first point to bear in mind is that the buffer zone perimeter is not an impermeable barrier that prevents the transmission of Plaintiffs' message to individuals within the zone. Plaintiffs can speak to women who are inside the zone or hand leaflets to them if they are within arm's reach. Plaintiffs can begin a conversation with a woman outside the zone and continue it as the woman enters the zone, or can initiate a conversation with a woman while she is in the zone and continue it as she exits.

The second, closely related point is that, because the zone is situated around a point of ingress and egress, potential listeners will be moving through the zone rather than standing in a fixed location beyond earshot. And the 15–foot buffer does not require Plaintiffs to remain 15 feet away from patients—just 15 feet away from the clinic doors. Practically speaking, then, a woman entering the clinic will at first be quite close to the speaker and then only gradually move 15 feet away, while a woman exiting the clinic will begin 15 feet away but then move into close proximity.

Therefore, a buffer zone around clinic entrances does not really exclude speech throughout a physical zone, but rather creates a temporal window during which listeners are unable or less likely to receive the speaker's message. The length of that window defines the actual speech burden imposed by the buffer regulation. Here, the window seems short. With respect to oral communication, the Supreme Court in *Hill* concluded that a rule prohibiting

speakers from entering within eight feet of a listener still "allows the speaker to communicate at a normal conversational distance." [39] Accepting this premise, the Ordinance creates two relevant zones: an eight-foot zone in which listeners can presumptively be reached through Plaintiffs' particular brand of conversational messaging, and a seven-foot zone in which listeners cannot be reached (or only reached with difficulty). Women entering or leaving a clinic will likely traverse this seven-foot "no-speech" zone in three or four steps—a matter of seconds. The deprivation of those few seconds of messaging seems like a minimal burden on Plaintiffs' speech.

It also seems like a much lesser burden than the one imposed by the Massachusetts buffer zone, which created a 27–foot "no-speech" zone in which women presumably could not be reached. And while it may be debatable whether Plaintiffs would truly be unable to communicate with a woman in the inner seven-foot zone around Pittsburgh clinics, it is much more likely that they would have been completely unable to communicate with a woman who was well within the 27–foot zone in *McCullen*. By the same token, if women traversing the Pittsburgh buffer zone largely remain within earshot of Plaintiffs' message, that would also alleviate the concern raised in *McCullen* that "[i]f all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled [sidewalk counselors'] message." [40]

Plaintiffs, following the Supreme Court's lead in *McCullen*, also allege that the Ordinance makes it more difficult for them to distinguish patients from passersby and initiate conversations before they enter the buffer zone. I have not found support for the implicit premise that

**39.** *Hill,* 530 U.S. at 726–27, 120 S.Ct. 2480.

**40.** *McCullen,* 134 S.Ct. at 2537.

speakers have a First Amendment right to identify preferred listeners. Either way, here again there is a qualitative distinction between a 35–foot buffer and a 15–foot buffer. A patient heading toward a clinic will almost certainly have manifested her intention to enter the clinic by the time she is 15 feet from its entrance, but is less likely to have done so at 35 feet out. A patient would have to be lost or particularly furtive to avoid being noticed by counselors standing 15 feet from the clinic doors. Thus, assuming that Plaintiffs' ability to recognize patients is a valid First Amendment consideration, I doubt that the Ordinance seriously hampers that ability.

The Ordinance does, however, place a greater burden on leafleting. Unlike the statute in *Hill*, the Ordinance does not allow speakers to stand within the zone and hand out literature to passing women, but rather forces them to do so from outside the zone. But as we noted in *Brown*, "[a]lthough the buffer zone, standing alone, would require leafletters to remain beyond arm's reach of a medical facilities' entrances, they would still be able to approach individuals outside of the 15–foot radius in order to distribute their literature." [41] In *Hill*, the Supreme Court "noted approvingly that the bubble zone allowed leafletters to stand stationary in the path of oncoming pedestrians," which is also the case for Plaintiffs 15 feet away from the clinic entrance.[42] And because the smaller 15-foot zone gives Plaintiffs more time to identify potential patients, it affords great-

er opportunity to physically intercept listeners and offer literature.

***Scope of Prohibited Activity.*** The Massachusetts law made it unlawful for anyone to "knowingly enter or remain" within a buffer zone. The Pittsburgh Ordinance makes it unlawful to "knowingly congregate, patrol, picket or demonstrate" within a buffer zone. There are at least two consequential distinctions between these prohibitions.

First, as the *McCullen* Court disapprovingly observed, the Massachusetts law prohibited all speech of any kind within the zone, from political advocacy all the way down to cell phone conversations or casual discussions about the weather. The Pittsburgh Ordinance, by contrast, restricts only certain kinds of protest speech— "picketing" and "demonstrating." [43] To be sure, such speech is core First Amendment speech. But it is nonetheless true that the Ordinance's prohibitions sweep far less widely than the Massachusetts law, and do not prohibit innocent or casual speech within the zone.

Second, the Ordinance, unlike the Massachusetts law, permits protesters and counselors to move through the buffer zone. This understanding has been confirmed by the City in a limiting interpretation.[44] The City explains in its brief that before the December 2014 preliminary injunction hearing, "Ms. Bruni and the other plaintiffs apparently believed the Ordinance prohibited them from passing through the zone at all even if they re-

---

41. *Brown*, 586 F.3d at 281.

42. *Id.* at 278 (citing *Hill*, 530 U.S. at 727–28, 120 S.Ct. 2480).

43. The majority is therefore incorrect to characterize the Ordinance as a "blanket prohibition on Plaintiffs' speech in a historically-public forum." Maj. Op. 371.

44. *See Brown*, 586 F.3d at 274 ("When considering a facial challenge to a state law, 'a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.' " (quoting *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982))).

frained from prohibited conduct while in the zone—for example, if they were standing on one side of the clinic's doorway and wanted to engage someone approaching from the other side. However, that erroneous understanding has been clarified...." [45] To the extent this limitation gives Plaintiffs greater opportunity to physically intercept patients before they enter the zone or on their way out, it bears directly on whether the Ordinance burdens sidewalk counseling "substantially" more than necessary.

*Statutory Reach.* A key failing of the Massachusetts law was its overbreadth: while the record showed that congestion was only a problem at one Boston clinic on Saturday mornings, the law created permanent buffer zones at every single clinic throughout the state. "For a problem shown to arise only once a week in one city at one clinic, creating 35–foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution." [46] The Pittsburgh Ordinance, by contrast, only applies to clinics within one city. Moreover, following the District Court's post-remand injunction, the City must clearly demarcate any buffer zone prior to its enforcement.[47] The Complaint only identifies one such demarcated buffer zone, outside the downtown Planned Parenthood Clinic.[48] And because the Ordinance only prohibits certain types of protest speech, it does not ban speech throughout the week like the Massachusetts law, but only at times when protest activity actually occurs. In contrast to the Massachusetts law, the Pittsburgh Ordinance appears tailored to address a particular problem in a particular location at particular times.

* * *

Accordingly, there are strong practical and doctrinal reasons to conclude that the City's buffer zones are qualitatively different from—and burden significantly less speech than—the Massachusetts buffer zones in *McCullen.* There is correspondingly less reason to conclude that the mere possibility of less-intrusive alternatives requires a finding that the Ordinance burdens substantially more speech than necessary.

I agree with the majority, however, that it is not the Court's role on a 12(b)(6) motion to supplant the well-pleaded allegations with its own speculation, or to question the Plaintiffs' characterization of their experiences. The Ordinance may function in the ways I have described above; it may not. What Plaintiffs allege in the Complaint, however, is that the Ordinance "prohibits Plaintiffs and others from effectively reaching their intended audience"; that the Pittsburgh zones "make it more difficult [for the] Plaintiffs to engage in sidewalk counseling, prayer, advocacy, and other expressive activities"; and that the Ordinance "will cause conversations between the Plaintiffs and those entering or exiting the facilities to be far less frequent and far less successful." [49] These are plausible consequences of the buffer zone's restrictions on sidewalk counseling activity, which, according to Plaintiffs, can only be undertaken "through close, caring, and personal conversations, and cannot be conveyed through protests." [50] And while Plaintiffs may be able to speak with women in the zone, there is no dispute that the

45. City Br. 18.

46. *McCullen,* 134 S.Ct. at 2539.

47. App. 150a.

48. App. 57a.

49. App. 56a, 60a.

50. App. 61a.

Ordinance categorically prohibits leafleting within a fixed portion of a public forum.[51]

The Complaint also includes allegations suggesting that the Ordinance sweeps more broadly than necessary to meet the City's interests. As in *McCullen*, the City's use of a fixed buffer zone plausibly suggests that the City adopted the Ordinance because it would be easy to enforce, rather than because less intrusive measures could not serve its legitimate interests. Plaintiffs also claim that different laws targeted only at harassing or obstructive behavior, such as the ones discussed in *McCullen*, would burden less speech than the fixed buffer zones imposed by the Ordinance. And crucially, Plaintiffs allege that "no specific instances of obstructive conduct outside of hospitals or health care facilities in the City of Pittsburgh . . . provide support for the law." [52]

*McCullen* instructs us to be sensitive to context and to the practical effects of the Ordinance on Plaintiffs' particular messaging strategy. The allegations in the Complaint, taken as true, plausibly establish that the Ordinance burdens substantially more speech than is necessary to achieve the City's legitimate interests. It is up to a factfinder to determine whether the Ordinance in fact burdens "substantially" more speech than necessary (or, conversely, whether alternative measures would burden "substantially" less speech while still

meeting the City's interests). I disagree with the majority's conclusion that the availability of unexamined, less-restrictive alternatives is sufficient, standing alone, to establish a constitutional violation. But I cannot conclude, on the basis of the allegations in the Complaint, that the Pittsburgh buffer zones operate so differently from the Massachusetts zones that Plaintiffs cannot advance past the pleading stage.

Accordingly, I concur in the judgment denying the City's motion to dismiss the free speech claim.

*Pedro A. CORTES; Jonathan M. Marks, Appellants.

---

**51.** The ability to leaflet was a key feature of the Colorado statute upheld in *Hill* and a crucial failing of the Massachusetts law struck down in *McCullen*. As *Hill* acknowledged and *McCullen* emphasized, "handing out leaflets in the advocacy of a politically controversial viewpoint is the essence of First Amendment expression; no form of speech is entitled to greater constitutional protection." *McCullen*, 134 S.Ct. at 2536. A sidewalk counselor who stands in place offering leaflets for a patient to accept or reject does not seem like a serious impediment to patient access or public safety. That said, the Ordinance could con-

ceivably be construed to permit leafleting in the buffer zone while still prohibiting counseling and other forms of importunate speech. The Ordinance only prohibits "congregating," "patrolling," "picketing," and "demonstrating" within the zone. Silent leafleting does not fit cleanly into "picketing" or "demonstrating," and clearly is not covered by "congregating" or "patrolling." The Ordinance may be susceptible to a limiting construction in this regard.

